## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MURRAY ZUCKER, Derivatively on Behalf of Nominal Defendant, ZEBRA TECHNOLOGIES CORPORATION, | Case No. |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| ANDERS GUSTAFSSON, MICHAEL C. SMILEY, MICHAEL A. SMITH, RICHARD L. KEYSER, ANDREW K. LUDWICK, ROSS W. MANIRE, FRANK MODRUSON, JANICE ROBERTS, and CHIRANTAN DESAI, | |
| Defendants, | |
| and | |
| ZEBRA TECHNOLOGIES CORPORATION, | |
| Nominal Defendant. | |

### VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Murray Zucker ("Plaintiff"), by and through his undersigned attorneys, brings this action derivatively on behalf of nominal defendant Zebra Technologies Corporation ("Zebra" or the "Company") and alleges upon personal knowledge as to himself and his own acts and, as to all other matters, based upon the investigation conducted by his attorneys, which included, among other things, a review of filings with the Securities and Exchange Commission ("SEC") and in the Securities Action (as defined below), analyst reports, press releases, and other publicly available information regarding the Company.

**INTRODUCTION**

1.      This is a stockholder derivative action brought on behalf of and for the benefit of nominal defendant Zebra, a Delaware corporation headquartered in Illinois, against certain current and former officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duty and other violations of law.

2.      Zebra designs, manufactures, and sells a variety of data-transfer products, such as barcode scanners, mobile computers, tablets, and specialty printers for barcode labeling.

3.      Between March 17, 2015, and November 1, 2016 (the "Relevant Period"), the Individual Defendants (defined below) caused Zebra to make materially false and/or misleading statements and to fail to disclose material adverse facts about the Company's business, operation, and prospects.

4.      In April 2014, Zebra announced that it would acquire Motorola Incorporated's Enterprise division ("Motorola Enterprise" and the "Motorola Enterprise Acquisition"). The acquisition, which was likely a strategic move to reduce competition, was finalized on October 27, 2014. However, following the acquisition, the Individual Defendants enacted and participated in a scheme to conceal the complications associated with the flawed integration of Motorola Enterprise into the Company and the significant cost it would take to remedy them.

5.      Prior to the acquisition, Motorola Enterprise was far larger than Zebra, with net sales nearly two and one-half times larger than Zebra's. Accordingly, once the deal closed, in October of 2014, Zebra was tasked with, *inter alia*, migrating an enormous amount of data from Motorola Enterprise onto its own systems, combining the sales forces and compensation structures of the two companies, aligning the companies so it could properly prepare the taxes of the now much larger Zebra, and rebranding the Motorola Enterprise business as part of Zebra.

6.      The Individual Defendants repeatedly represented to the investing public that the Motorola Enterprise Acquisition would result in significant cost savings for the combined companies. In truth, the Individual Defendants either hid or were negligent in not knowing that any cost savings realized from the acquisition would be offset by hundreds of millions of dollars in incremental spending to integrate the companies and to fix severe and undisclosed problems encountered during the migration from Motorola-supported IT systems to Zebra's.

7.      Initially, the Individual Defendants denied the existence of problems integrating Motorola Enterprise and claimed, *inter alia*, that the integration was "progressing as planned." The Individual Defendants represented that they were "very pleased with the progress of our integration efforts." In reality, the Individual Defendants knew, or recklessly disregarded, that the integration of Motorola Enterprise into Zebra had become quite burdensome, ultimately requiring the Company to spend up to $200 million dollars to resolve the issues.

8.      Moreover, around or shortly after the time of the acquisition, the Individual Defendants decided to rebrand the operations of Motorola Enterprise at a significant cost.

9.      The Individual Defendants' statements regarding the cost synergies expected to be realized by the Motorola Enterprise Acquisition were materially false and misleading when made. The Individual Defendants knew such representations failed to disclose material facts associated with the scope of the costs to integrate and rebrand the operations of Motorola Enterprise.

10.     Further, after the acquisition, the Individual Defendants identified deficiencies in Zebra's internal controls over financial reporting and disclosure controls and procedures. Despite the partial disclosure contained in the identification of material weaknesses in its internal controls and procedures over financial reporting, Zebra continued to provide false financial

guidance throughout the Relevant Period including, *inter alia*, gross margin based on failing to account for the costs of Motorola Enterprise integration.

11. On August 11, 2015, Zebra announced its financial results for the second quarter of 2015 and revealed that it would not achieve its previously issued gross margin guidance. The Individual Defendants disclosed that the miss was a result of the "impact of purchase accounting and one-time accounting adjustments related to [Motorola] Enterprise that adversely affected results" and "expenses associated with the rebranding of products containing the Motorola marks."

12. Nevertheless, the Individual Defendants continued to make false and misleading statements about the true costs associated with the Motorola Enterprise Acquisition by announcing, the same day, that Zebra "remain[ed] on track to achieve our target of $150 million of run rate savings by the end of 2016." In actuality, Zebra needed to spend a large percentage of its relatively small cash balance to remedy the systemic problems with the IT systems migration and rebrand the operations of Motorola Enterprise, which the Individual Defendants knew, or recklessly ignored, would largely offset the cost synergies and savings that the Individual Defendants had boasted about.

13. The Individual Defendants further violated the federal securities laws by issuing a false and misleading Proxy Statement on April 15, 2016, in an attempt to have many of the Individual Defendants reelected to the Board and secure compensation for certain Individual Defendants that was not in keeping with the Company's averred compensation policy.

14. Finally, the Individual Defendants' scheme came to head on November 1, 2016, when Zebra issued a press release disclosing that it had decided to restate its previously issued

financial statements for 2015 and the first and second quarters of 2016 due to $180 to $200 million in incremental spending to integrate the IT systems of Motorola Enterprise.

15.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by engaging in the wrongdoing alleged herein.

16.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, Zebra has sustained damages including, *inter alia*, the cost of the restatement, harm to the reputation of the Company, and tax penalties and their concomitant costs.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

18.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Zebra occurred in this District, and defendants have received substantial compensation in this

District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

20.     Plaintiff is a stockholder of Zebra, was a stockholder of Zebra at the time of the wrongdoing alleged herein and has been a stockholder of Zebra continuously since that time.

21.     Nominal defendant Zebra is a Delaware corporation with its principal executive offices located at 3 Overlook Point, Lincolnshire, Illinois 60069. Zebra builds tracking technology and solutions, such as barcode scanners and imagers, mobile computers, tablets, wireless LAN ("WLAN") software, radio frequency identification device ("RFID") readers, interactive kiosks, and specialty printers. Zebra common stock is listed and trades on the NASDAQ under the ticker symbol "ZBRA."

22.     Defendant Anders Gustafsson ("Gustafsson") has served as Zebra's Chief Executive Officer ("CEO") and a director of the Company since September 4, 2007.

23.     Defendant Michael C. Smiley ("Smiley") served as Zebra's Chief Financial Officer ("CFO") from May 1, 2008 until November 15, 2016 when he resigned from Zebra.

24.     Defendant Michael Smith ("Smith") has served as a director of Zebra since 1991 and as Chairman of its Board since 2007. Smith is the Chair of the Audit Committee and the Nominating and Governance Committee, and a member of Zebra's Compensation Committee.

25.     Defendant Richard Keyser ("Keyser") has been a director of the Company since 2008. He is the Chair of the Board's Compensation Committee as of May 2015, and a member of the Board's Nominating and Governance Committee.

26.     Defendant Andrew Ludwick ("Ludwick") has been a director of Zebra since May 2008. He is also a member of the Board's Audit Committee.

27. Defendant Ross Manire ("Manire") has been a director of Zebra since 2003. Manire is a member of the Board's Audit and the Nominating and Governance Committees.

28. Defendant Frank Modruson ("Modruson") has been a director since February 2014. Modruson is also a member of the Board's Audit Committee.

29. Defendant Janice Roberts ("Roberts") has been a director of the Company since October 2013. Roberts is a member of the Board's Compensation Committee.

30. Defendant Chirantan Desai ("Desai") has been a Zebra director since December 2015. Desai is a member of the Board's Compensation Committee.

31. Defendants Gustafsson, Smiley, Smith, Keyser, Ludwick, Manire, Modruson, Roberts, and Desai are collectively referred to as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32. By reason of their positions as officers and directors of Zebra, and because of their ability to control Zebra's business and corporate affairs, the Individual Defendants at all relevant times owed Zebra and its stockholders the fiduciary duties of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Zebra and its stockholders so as to benefit all stockholders equally, and not in furtherance of their personal interests or benefit.

33. Each director and officer of Zebra owes Zebra and its stockholders the fiduciary duties to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. Importantly, as officers and directors of a publicly-held company, the Individual Defendants have a duty to ensure Zebra establishes proper internal controls so that it complies with reporting requirements and disseminates accurate and truthful information with regard to

Zebra and its current and forecasted financial condition so that Zebra's value is accurately portrayed.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zebra, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of Zebra and was at all times acting within the course and scope of such agency.

36.     To discharge their duties, the officers and directors of Zebra were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Zebra were required to, among other things:

     a.  manage, conduct, supervise, and direct the business affairs of Zebra in accordance with all applicable laws;

     b.  neither violate nor knowingly permit any officer, director, or employee of Zebra to violate applicable laws, rules, and regulations;

     c.  establish and maintain accurate records and reports of the business and affairs of Zebra;

     d.  ensure that the Company complied with its legal obligations and requirements;

     e.  conduct the affairs of the Company in an efficient, business-like manner, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

f. remain informed of how Zebra conducts its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

37. Each of the Individual Defendants, by virtue of his or her position as a director and officer, owed Zebra and its stockholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

38. Zebra holds itself to specific corporate governance principles in addition to the requirements of law. For example, in its Corporate Governance Guidelines, Zebra described the responsibilities undertaken by the Board:

> Zebra's primary objective is to optimize stockholder value over the long term. Zebra's business is managed under the direction of its Board of Directors, which is elected by the stockholders. The basic responsibility of the Board is to exercise its business judgment to act in what it believes to be the best interests of Zebra and its stockholders.
>
> The Board believes that sound governance practices provide an important framework to assist it in fulfilling its duties to stockholders of care, loyalty, and good faith. Consequently, the Board seeks to tailor Zebra's governance structure and practices in the most efficient and effective manner to meet the needs of Zebra.

39. Additionally, the Company purports to conduct its business pursuant to its Code of Business Conduct (the "Code"). The Code in relevant part, states:

> Since the company's inception in 1969, Zebra's leadership has always had a strong commitment to high ethical standards. Zebra's reputation and the continuing success of our business depend upon all Zebra employees conducting our activities with integrity and in compliance with the law. This integrity is critical to both our business success and our outstanding reputation in the community.

Our stockholders, employees, customers, partners and suppliers expect it.

Conducting business with integrity means that we are honest, trustworthy, objective and fair in our dealings and that we treat each other with dignity and respect. Zebra managers are responsible [for] ensuring that the Code is understood and enforced within their teams.

40.     Further, the Company has also established a Code of Ethics for Senior Financial Officers. Defendants Gustafsson and Smiley were and are subject to the terms of the Code of Ethics, which states in relevant part:

1.      The CEO, the CFO, and the Vice President and Controller (the "Senior Financial Officers") hold an important and elevated role in corporate governance, vested with both the responsibility and authority to protect, balance, and preserve the interests of all of the enterprise stakeholders, including stockholders, customers, employees, suppliers, and citizens of the communities in which business is conducted. Senior Financial Officers fulfill this responsibility by prescribing and enforcing the policies and procedures employed in the operation of the enterprise's financial organization and by acting in good faith and in the company's best interests in accordance with the company's Code of Conduct and to the additional provisions of this Code of Ethics.

2.      Senior Financial Officers will establish and manage the enterprise transaction and reporting systems and procedures to provide that:

   a.      No false or artificial statements or entries for any purpose are made in the company's books and records, financial statements and related communications; and

   b.      Periodic financial communications and reports will include full, fair, accurate, timely and understandable disclosure.

3.      Senior Financial Officers will establish and maintain mechanisms to:

a. Monitor the compliance of the finance organization with any applicable federal, state or local statute, regulation or administrative rule; and

b. Identify, report and correct in a swift and certain manner, any detected deviations from applicable federal, state or local statute or regulation.

4. Senior Financial Officers will promptly bring to the attention of the Disclosure Committee and to the Audit Committee:

a. Material information that affects the disclosures made by the company in its public filings; and

b. Information concerning significant deficiencies in the design or operation of internal controls that could adversely affect the company's ability to record, process, summarize and report financial data.

41. Finally, the Audit Committee Charter states that the Audit Committee of the Board was established "to provide assistance to the Board in fulfilling its oversight functions." To that end, the Audit Committee Charter states that the Audit Committee (on which defendants Smith, Ludwick, Manire, and Modruson served) "shall provide assistance to the Board in fulfilling its oversight functions" with respect to matters involving, *inter alia*:

(1) the integrity of Zebra's financial statements and internal control over financial reporting, (2) the independent public accounting firm's qualifications and independence (the "Auditors"), (3) the performance of the internal audit function and the independent public accounting firm, (4) the assessment and management of risk, and (5) Zebra's compliance with legal requirements. In so doing, it shall be the goal of the Committee to maintain free and open means of communication between the members of the Board, the Auditors, Zebra's financial management and Zebra's internal auditing staff.

42. The functions of the Audit Committee include:

1. Financial Reporting

a. Review earnings press releases.

b. Meet with the Auditors and Zebra's management and the internal auditing staff to discuss, review and comment on (1) Zebra's interim and annual financial statements prior to the public announcement of financial results and the filing of the Form 10-Q or 10-K with the SEC; (2) any material changes in accounting principles or practices used in preparing the financial statements; (3) disclosures relating to internal control over financial reporting; (4) the items required by applicable generally accepted auditing standards relating to the conduct of the audit of annual financial statements or review of interim financial statements; and (5) Zebra's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations'" included in Zebra's Form 10-Q or 10- K.

c. Based upon discussions with, and reliance upon, the Auditors and Zebra's management, cause to be prepared a report for inclusion in Zebra's proxy statement, which report will satisfy the requirements of the Securities Exchange Act of 1934 (the "Exchange Act").

d. Discuss with the Auditors their judgments about the quality, not just the acceptability, of Zebra's accounting principles and financial disclosure practices used or proposed and the appropriateness of significant management judgments.

e. Discuss with management and the Auditors the effect of regulatory and accounting initiatives as well as off-balance sheet structures on Zebra's financial statements.

2. Independent and Internal Audit Processes

a. Select, evaluate, appoint, establish compensation for, and when appropriate, replace the Auditors. Also oversee resolution of disagreements between the Auditors, Zebra's management and Zebra's internal auditing staff regarding issues relating to accounting standards, financial reporting, the preparation of Zebra's financial statements and periodic reports or such other related issues that the Committee deems appropriate.

b.     Pre-approve and adopt such procedures for the pre-approval of all auditing services and permitted non-audit services to be provided to Zebra by the Auditors as required by Section 10A(i) of the Exchange Act and related rules. The Committee may delegate, subject to any rules or limitations it deems appropriate, to one or more members of the Committee the authority to grant such preapprovals; provided, that the decisions of any member to whom authority is so delegated shall be reported to the full Committee at its next meeting.

c.     At least annually, (1) consider the independence of the Auditors, including whether the provision by the Auditors of permitted non-audit services is compatible with independence and (2) obtain and review annually from the Auditors, a report describing all relationships between the Auditors or its affiliates and Zebra or individuals in a financial oversight role at Zebra, that may reasonably be thought to bear on the Auditor's independence, and discuss with the Auditors the potential effects of any such disclosed relationships on the Auditors' independence.

d.     Obtain and review at least annually a report from the Auditors concerning the Auditors' internal quality control procedures; any material issues raised by the most recent internal quality-control review, or peer review or Public Company Accounting Oversight Board review, of the Auditors, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the Auditors, and any steps taken to deal with any such issues.

e.     Review the annual audit plan of the Auditors and evaluate their performance.

f.     Review the experience and qualifications of the senior members of the Auditor's team.

g.     Review with the Auditors the results of the audit, any problems or difficulties that the Auditors encountered in the course of performing the audit and management's response, and any questions or

concerns the Auditors may have relating to internal controls and accounting practices and procedures.

h.  Review, at least annually, the scope and results of the internal audit program, including then current and future programs of Zebra's Internal Audit Department, procedures for implementing accepted recommendations made by the Auditors, and any significant matters contained in reports from the Internal Audit Department.

i.  Review a report from the Auditors periodically, but no less than annually, as to (i) all critical accounting policies to be used, (ii) all alternative disclosures and treatments of financial information within generally accepted accounting principles that have been discussed with Zebra's management, the ramifications of the use of such alternative disclosures and treatments and the disclosures and treatments preferred by the Auditors; and (iii) other material written communications between the Auditors and Zebra's management, including management letters and schedules of unadjusted differences.

j.  Require the rotation of the lead audit partner on a regular basis in accordance with the requirements of the Exchange Act.

k.  Review and approve or veto Zebra's hiring of employees or former employees of the Auditors who participated in any capacity in the audits of Zebra.

3.  Internal Controls Established by Management

a.  Upon management's recommendations, establish procedures for (i) the confidential, anonymous receipt, retention and treatment of complaints received by Zebra regarding accounting, internal accounting or financial controls, or auditing matters, and (ii) the confidential, anonymous submission by employees of Zebra of concerns regarding questionable accounting, financial or auditing matters.

b. Review and monitor Zebra's Code of Conduct (the "Code") and Zebra's protocol for addressing allegations of non-compliance with the Code.

c. Approve and periodically review an Ethics Code for Senior Financial Officers.

d. Review with the Auditors, Zebra's Internal Audit Department, and management: (a) the adequacy and effectiveness of the systems of internal controls (including any significant deficiencies and significant changes in internal controls reported to the Committee by the Auditors or management), accounting practices, and disclosure controls and procedures, of Zebra; and (b) current accounting trends and developments, taking such action as the Committee deems appropriate.

e. Perform such other functions as assigned by law, Zebra's certificate of incorporation or By-Laws, or the Board of Directors, or as are provided by NASDAQ, the SEC and the federal and state securities laws.

f. Review periodically with Zebra's vice president and general counsel, legal and regulatory matters that could have a significant effect on Zebra's financial statements.

43. The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of fiduciary duty described herein.

## SUBSTANTIVE ALLEGATIONS

**Company Background**

44. Zebra was originally incorporated under the name "Data Specialties Incorporated." It manufactured high-speed electromechanical products such as hole-punching and tape-reading machines. In 1986, after it introduced its first bar code printer, "The Zebra," the Company changed its name to Zebra Technologies Corporation. Zebra subsequently experienced

substantial success and, in August 1991, Zebra completed an initial public offering of 2.8 million shares.

45.     Zebra now has over eighty offices worldwide and has completed a number of large-scale acquisitions. The Company's operations consist of two segments: (1) Asset Intelligence & Tracking ("AIT"), the legacy Zebra business consisting of barcode and card printing, location solutions, supplies, and services operations; and (2) Enterprise Visibility & Mobility ("EVM"), formerly Motorola Enterprise, comprised of mobile computing, data capture, RFID, and services operations.

### A.     Zebra Acquires Motorola Enterprise

46.     On April 15, 2014, Zebra announced that it had reached a definitive agreement to acquire Motorola Enterprise for $3.45 billion in cash. Later that same day, on a conference call with analysts to discuss the announcement, defendant Smiley stated that the transaction would be funded "through a combination of $3.25 billion of new capital raised with debt and $200 million of cash on hand."

47.     At the time of Motorola Enterprise Acquisition, Motorola Enterprise was far larger than Zebra. Zebra had approximately 2,600 employees and $1 billion in revenues. Motorola Enterprise had approximately 4,500 employees and $2.5 billion in revenues.

48.     Despite the formidable task incorporating a much larger entity into Zebra, the Individual Defendants represented to investors that Zebra would realize significant synergies from the combination and downplayed or outright omitted the integration costs.

49.     On the April 15, 2014 conference call, defendant Smiley stated that "[w]e expect the transaction to be materially accretive in the first full year on a cash EPS basis. As synergies are realized, we expect the acquisition ROIC to exceed our cost of capital within three years."

50.     Defendant Smiley also announced during the conference call that Zebra expected to have a significant leverage ratio "of around five times debt-to-adjusted EBITDA at closing." A report issued the same day by analysts at Wells Fargo Securities expressed concern about the substantial debt the Company would be taking on in connection with its Motorola Enterprise Acquisition, stating that "*the leverage ratio of 5.0x at the close of the deal increases the company's risk profile given the cyclicality of the business*." (Emphasis added).

51.     On October 27, 2014, Zebra closed the Motorola Enterprise Acquisition for $3.45 billion in cash. Sources such as *The Wall Street Journal* speculated that the sizeable acquisition was executed in an attempt to box out competition by combining Zebra's barcode technology with Motorola's computers and scanners. The Master Acquisition Agreement between the parties contained a provision that stated that the acquired assets included all of Motorola Enterprise's "Trade Receivables," *i.e.* "[a]ll of the accounts and notes receivable and unbilled revenues to the extent relating to or arising from the sale of goods or materials and the rendering of services in connection with the operation of the Business (the 'Accounts Receivable'), together with all unpaid interest accrued thereon, if any."

52.     Thereafter, the Individual Defendants repeatedly touted the significant "savings" and "synergies" that would be realized from the Motorola Enterprise Acquisition.

53.     On Zebra's November 4, 2014 earnings call, defendant Gustafsson lauded the significant savings to be achieved as a result of the acquisition, stating:

> [W]e are committed to creating shareholder value through achieving $150 million in cost synergies. We expect $100 million of these savings to be realized in operating expenses and $50 million in cost of goods, as we streamline the purchasing of common components and rationalized vendors. Our current plan calls for exiting 2015 with [$50] million to $75 million in captured synergies on a run-rate basis, with the remainder achieved the following year.

(Emphasis added).

54.　　In addition, during the call, defendant Gustafsson commented on the integration to Zebra's ERP system, stating, in pertinent part, as follows:

> ***By the time of closing, we successfully completed a complex cut-over to the ERP system supporting the enterprise business in a short amount of time. Our hard work ahead of the close enabled us to take orders and ship products at volume from day one. We have already made significant progress on integrating the enterprise business.***

(Emphasis added).

55.　　The Individual Defendants continued to make positive statements about both the progress of the integration and the savings that the Company would realize from the Motorola Enterprise Acquisition. On November 11, 2014, defendant Smiley represented Zebra at Robert W. Baird & Co. Inc.'s Industrial Conference. During his presentation, defendant Smiley discussed the integration to Zebra's ERP system, in pertinent part, as follows:

> The integration is well underway. We actually obviously closed the transaction a couple weeks ago. One thing we are really excited about is we turned onto ERP systems -- is we had to clone what we acquired. And we turned it on, and it's functioning really well. I'm going to tell you that's not a small feat. But I think that's another testimony to the fact that we can execute well. So that's working well for us.

56.　　On Zebra's March 17, 2015 earnings call, defendant Gustafsson told the market that the Company was "***on target to achieve the $150 million in synergies by the end of 2016, with $50 million to $75 million in savings this year.***" (Emphasis added).

57.　　However, in reality, the integration of Motorola Enterprise had run into several severe problems, including the migration of relevant data from Motorola Enterprise's IT systems onto Zebra's systems. These issues required significant unforeseen monetary expenditure by the Company to fix and would largely offset any purported savings to be realized in the short term

from the acquisition. Defendants Smiley and Gustafsson were aware of or deliberately disregarded the existence of these material problems with the Motorola Enterprise integration.

58. The root cause of many of Zebra's problems with the integration related to the migration of data between Motorola's and Zebra's Enterprise Resource Planning ("ERP") systems. ERP systems incorporate a company's crucial business functions including sales and distribution, production planning, logistics execution, and supply chain management. Motorola Enterprise's historical data was located on Motorola Solutions' systems. Zebra entered into a contract with Motorola Solutions to allow Zebra to access Motorola Solutions' systems to extract the data for Motorola Enterprise. Zebra then had to merge Motorola Enterprise's data into Zebra's systems.

59. There were many challenges associated with completing this task. Problems associated with assembling data from Motorola Enterprise severely impacted Zebra's ability to, *inter alia,* develop and execute its sales compensation plan and prepare its tax returns. Despite all of these issues, during the Relevant Period, the Individual Defendants led the market to believe that the integration was going smoothly and failed to disclose the true extent of the cost of the integration process.

**B. The Individual Defendants Cause Zebra to Issue False and Misleading Statements**

60. On March 17, 2015, Zebra filed its annual financial report on Form 10-K with the SEC for the fiscal year 2014 (the "2014 10-K"). It was signed by defendants Gustafsson, Smiley, Smith, Keyser, Ludwick, Manire, Modruson, and Roberts, and was also certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Gustafsson and Smiley attesting to the accuracy of financial reporting, and the disclosure of all fraud. The 2014 10-K addressed changes in the Company's internal controls over financial reporting, as follows:

> ***In connection with our initial reviews of internal controls for Enterprise, we have identified certain internal control deficiencies related to Enterprise.*** We continue to identify and review the internal controls of the Enterprise business and are establishing a plan of remediation that is consistent with our obligation to assess the effectiveness of Enterprise's internal controls over financial reporting as of December 31, 2015.
>
> The identification review, assessment and remediation of internal control deficiencies is overseen by senior management and our audit committee, and is undertaken primarily through the integration of processes and procedures with existing Zebra processes and procedures, development and implementation of formal policies, improved processes and documented procedures, as well as the hiring of additional finance personnel.
>
> During the quarter covered by this report, there have been no other changes in our internal controls that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

(Emphasis added).

61.    In Zebra's subsequent Forms 10-Q and 10-K, Zebra continued to identify deficiencies in its internal controls. However, the Individual Defendants also continued to issue false and misleading financial guidance to the market. Each quarter, the Individual Defendants provided guidance on metrics for the following quarter, including Zebra's gross margins.

62.    Zebra would later recognize, on February 29, 2016, that the "material weakness relates to deficiencies in the design and operation of controls in response to the increased complexity in the legal entity structure of the business following the Motorola Enterprise Acquisition. These deficiencies impacted our ability to accurately forecast pretax income and deferred taxes, by legal entity, in a timely manner."

63.    On May 13, 2015, the Individual Defendants caused Zebra to issue a press release announcing its first quarter 2015 financial results for the three months ended April 4, 2015 ("1Q15 Press Release"). In the 1Q15 Press Release, defendant Gustafsson commented on the

cost synergies and integration of the Motorola Enterprise Acquisition, stating in pertinent part as follows:

> *During the quarter we also made material progress on achieving our cost-synergy targets, pursuing growth initiatives and integrating Zebra with the Enterprise business acquired from Motorola Solutions in October.*

(Emphasis added).

64.     During a May 13, 2015 earnings conference call, defendant Gustafsson discussed the Company's integration, cost synergies, and savings relating to the Motorola Enterprise Acquisition, in pertinent part, as follows:

> We also made meaningful progress on our synergy, integration, and growth goals. . . . To date, we have achieved $50 million in cost synergies on an annualized basis, related to the acquisition. In addition to completing the sales force consolidation, in order to present a solid unified approach to the customer, we have merged several facilities, rationalized part of our supply chain organization, and achieved cost savings from reducing the number of services provided under the transition services agreement with Motorola. This progress reinforces our confidence in our capacity to meet or exceed our long-term growth, profit and debt leverage objectives.

65.     Also, on the May 13, 2015 conference call, defendant Smiley discussed Foreign Exchange ("FX") "headwinds" the Company would be experiencing in the upcoming quarter, but claimed that they would be offset by sales and cost synergies, in pertinent part, as follows:

> Our guidance also incorporates a minor sequential FX headwind. In late April, we implemented a price increase on Euro-denominated sales. The initial effect of the increase has not had a meaningful impact on our business, which is consistent with our expectations. It will have a minor positive effect on second-quarter sales, with a more pronounced impact in the second half of this year. Combined with our trajectory on sales and cost synergies, we expect to offset much of the currency headwinds that are affecting the business in the near term.

66. During the call, defendant Smiley elaborated on the Company's cost synergies and run rate savings, in pertinent part, as follows:

> First-quarter EBITDA reflects good progress on our synergy efforts, and we are close to our goal of achieving an 18% to 20% EBITDA margin. To date, we have captured approximately $50 million in run rate savings, and remain on track to achieve our target of $150 million of run rate synergies by the end of 2016. In addition, we believe the potential exists to achieve even more synergies beyond the two-year timeframe.

67. Furthermore, on the May 13, 2015 conference call, defendant Smiley provided Zebra's gross margin outlook for the second quarter of 2015, in pertinent part, as follows:

> We expect non-GAAP earnings for the second quarter in the range of $1 to $1.25. This forecast assumes gross margin in the range of 45.5% to 46.5%.

68. During the question and answer portion of the conference call, an analyst asked defendant Smiley about cost synergies and run rate savings, in pertinent part, as follows:

> Brian Drab - William Blair & Company – Analyst
>
> I just wanted to first ask about the cost synergies, and what do you expect the run rate in savings to be by the end of 2015? And could you elaborate on what you meant by, I think you used the phrasing more synergies in future years. Is that more beyond the $150 million?
>
> Mike Smiley - Zebra Technologies Corporation – CFO
>
> ***So, Brian, I think we've been saying that by the end of the year, we'll have $70 million-ish at the end of the year. I wouldn't be surprised if we do slightly better than that. I think we're on a good run rate so far. The synergies beyond two years, we expect to have our ERP system integrated by the end of two years. And I think the value of that will allow us to be working on one system, which will take a little bit of burden off of the back end that supports all of our work, and so we expect to have some further modest improvement, as a result of being on one ERP system.***
>
> Brian Drab - William Blair & Company – Analyst
>
> And that's potential upside to the $150 million?

<u>Mike Smiley - Zebra Technologies Corporation – CFO</u>

Yes, yes.

(Emphasis added).

69.     On May 14, 2015, the Individual Defendants caused Zebra to file its quarterly financial report on Form 10-Q with the SEC for the first quarter of 2015, which was signed and certified pursuant to SOX by defendants Gustafsson and Smiley (the "1Q15 10-Q"). The 1Q15 10-Q included the financial results contained in the press release and also discussed the material weaknesses in the Company's disclosure controls and procedures that were first identified on March 17, 2015. The 1Q15 10-Q stated, in pertinent part:

> **Evaluation of Disclosure Controls and Procedures**
>
> We conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of the end of the period covered by this Form 10-Q. The evaluation was conducted under the supervision of our Disclosure Committee, and with the participation of management, including our Chief Executive Officer and Chief Financial Officer. ***Based on that evaluation, we have concluded that our disclosure controls and procedures were not effective as of April 4, 2015, as a result of a material weakness related to the process to review and prepare our quarterly income tax provision.***
>
> **Remediation Plan**
>
> Management and the Board of Directors are committed to the continued improvement of our overall system of internal controls over financial reporting and have already begun to implement additional controls and procedures to remediate the review and preparation process relating to our quarterly income tax provision prior to the end of the year.
>
> **Changes in Internal Control over Financial Reporting**
>
> As noted in our 2014 Form 10K, ***in connection with our initial reviews of internal controls for Enterprise, we have identified certain internal control deficiencies related to Enterprise.*** We

23

continue to identify and review the internal controls of the Enterprise business and are establishing a plan of remediation that is consistent with our obligation to assess the effectiveness of Enterprise's internal controls over financial reporting as of December 31, 2015.

The identification, review, assessment and remediation of internal control deficiencies is overseen by senior management and our audit committee, and is undertaken primarily through the integration of processes and procedures with existing Zebra processes and procedures, development and implementation of formal policies, improved processes and documented procedures, as well as the hiring of additional finance personnel.

During the quarter covered by this report, there have been no other changes in our internal controls that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

(Emphasis added).

70.     n addition, the 1Q15 Form 10-Q contained the following disclosure in its MD&A section:

Enterprise Gross Profit

Gross profit for Enterprise in the first quarter of 2015 was $244.6 million. Gross margin for Enterprise for the first quarter of 2015, was 43.1% of sales.

The gross profit margin was adversely affected by the strengthening of the U.S. dollar and higher service costs. Excluding currency effects, hardware gross profit margin was relatively consistent with recent trends while service margin was lower. The mix of hardware and services sales was essentially consistent with recent trends.

71.     On August 11, 2015, the Individual Defendants caused Zebra to issue a press release announcing its second quarter 2015 financial results for the three months ended July 4, 2015 ("2Q15 Press Release"). The 2Q15 Press Release reported, *inter alia,* that gross margins for the second quarter of 2015 came in 160 basis points lower than its gross margins for the first

quarter of 2015 and well below the level the Individual Defendants had led the market to expect for the quarter. Specifically, the 2Q15 Press Release stated, in pertinent part, as follows:

> Gross margin for the second quarter of 2015 of 44.2% includes an increase to costs of sales associated with purchase accounting adjustments, costs associated with the rebranding of Motorola product, as well as other costs not expected to recur. The purchase accounting adjustments and other cost factors negatively impacted gross margin percentage by approximately 1.1 percentage points. Compared to the 49.3% gross margin in the second quarter of 2014, gross margin percentage also reflects a change in mix associated with the sale of Enterprise products which generally have a lower gross margin than pre-transaction Zebra products and the impact of foreign currency movements, net of hedges.

72. Later that day, Zebra held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Gustafsson and Smiley, among others, participated in the call. In his prepared remarks, defendant Smiley commented on Zebra's lower than expected gross margin for the quarter, in pertinent part, as follows:

> Gross margin for the quarter was 44.2%. This reflects the impact of purchase accounting and one-time accounting adjustments related to Enterprise that adversely affected results. Additionally, we incurred expenses associated with the rebranding of products containing the Motorola marks. Product rebranding activities will continue according to the staggered cutover schedule through the end of next year. However, we expect the majority of this effort and the associated costs to be completed by the end of this year.

73. Analysts commented on the Company's reporting of its earnings and guidance numbers. For example, William Blair stated in an analyst report issued the next day that Zebra issued a "disappointing earnings result in the second quarter and lower-than-expected guidance for the third quarter. Although second-quarter revenue growth was solid (and in line with expectations), earnings were below expectations driven by a lower-than-expected gross margin." In addition, the William Blair report stated, in pertinent part, as follows:

> Gross margin contracted 150 basis points on a sequential basis . . . to 44.8% [sic]. This was lower than the consensus estimate of

46.4% and below management's guidance range of 45.5%-46.5%. Management attributed the lower-than-expected result to purchase accounting and other one-time accounting adjustments related to the acquisition of the enterprise business, which negatively affected gross margin by about 100 basis points.

74. In addition, analysts at Wells Fargo issued a report the same day discussing the Company's gross margins, in pertinent part, as follows:

> Gross Margin (GM) Light On F/X, Mix Shift & One-Time Impacts – The Q2 gross margin shortfall was a disappointment. Investor concerns were on Zebra's ability to hit revenue targets, but there was little concern on margin into Q2. Zebra's ability to forecast Q2 gross margin and to account for controllable expenses like Motorola re-branding expenses led to investors placing a greater discount on the company's long-term margin guidance. The company indicated that EBITDA margin would have been 19% in Q2 on a constant currency basis, which implies margin would be above 20% with full synergies. However, Zebra would not say on the call that it expects to recoup the entire margin lost to the stronger dollar even after price increases are implemented and component prices are renegotiated. We think the company is likely to recoup the lost margin and should bring EBITDA margin at least to the high-end of the guidance range, but for now the Street is less confident that Zebra can hit its margin guidance.

75. During the August 11, 2015 call, defendant Smiley also touted the purported savings and cost synergies in connection with the Motorola Enterprise Acquisition, as follows:

> To-date, with our focus on our cost synergy programs, improvements in operating leverage, we have captured approximately $60 million of savings and remain on track to achieve our target of $150 million of run rate savings by the end of 2016.

76. In addition, during the call, defendant Smiley discussed Zebra's investment in IT and its integration efforts, in an exchange with an analyst, in pertinent part, as follows:

> Richard Eastman – Robert W. Baird & Co. – Analyst:
>
> Okay. And then, just a second question, maybe for Mike. Could you address the free cash flow year-to-date? And maybe there's a couple big tax payments made in each of the quarters, if that

continues. But how does the – can you give us any sense of what the free cash flow should look like for the full year?

Michael Smiley – Zebra Technologies Corporation – CFO:

Yes. I guess, the big thing I would say is that, we certainly have big tax payments that go out in the second quarter, so that affected our cash flow. The other thing is, if you – if we can get you to come visit us here in Lincolnshire, we moved into a new consolidated business which drove some leasehold improvements, which is more or less a lot of it's behind us, which drove some of the CapEx numbers.

So generally – and as we go forward, I would say we will continue to invest in integrating the Company, that's primarily from an IT standpoint. So I would expect, though the first half had a meaningful part of leasehold improvement, the second half we will continue on with ERP integration activities. So again, I don't expect that the tax payments to be as meaningful as it was the second half. I would expect cash – the CapEx to be somewhat, maybe a little bit lower in the second half than the first half, because of the building leasehold improvements we made in the first half.

77. On November 10, 2015, the Individual Defendants caused Zebra to issue a press release announcing its third quarter 2015 financial results for the three months ended October 3, 2015 ("3Q15 Press Release"). Following the issuance of the 3Q15 Press Release, Zebra held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Gustafsson and Smiley, among others, participated in the call. In his prepared remarks, Defendant Gustafsson revealed that a massive incremental spend to complete the IT systems migration in connection with the Motorola Enterprise Acquisition was needed:

We expect to complete the systems migration, and be entirely off Motorola-supported IT systems before the end of 2017. The remaining costs to complete the overall integration program including capital expenditures are expected to be approximately ***$180 million to $200 million*** through 2017.

(Emphasis added).

78.     The $180 to $200 million in additional capital expenditures for completing the Motorola Enterprise integration was unexpected and far above the Company's prior estimate for the cost of integrating the two companies. In addition, Zebra announced that it had experienced problems integrating Motorola Enterprise's IT systems with its own.

79.     During the call, defendant Gustafsson was asked by an analyst about this substantial increase in spending and previously undisclosed issues in connection with the IT systems migration, in pertinent part, as follows:

> Andrew Spinola – Wells Fargo Securities, LLC – Analyst:
>
> . . . And just a clarification. I think, Anders, you made the comment, that there's another $180 million to $200 million of integration and acquisition spend between now and 2017, did I catch that correctly?
>
> Anders Gustafsson – Zebra Technologies Corporation – CEO:
>
> That's correct. That includes then, all the IT spend, including CapEx also. And we also said that would help yield substantial efficiencies past the 2017 date. So as we get into 2018, and so we expect to drive further operating leverage based on those investments.
>
> Andrew Spinola – Wells Fargo Securities, LLC – Analyst:
>
> Understood. Just stepping back from my perspective, it does seem like – I'm a little surprised the acquisition and integration spend was the highest this year in the third quarter. I would have thought it would be stepping down. And then, the fact that there's another $180 million to $200 million sounds like a good bit more than I was looking for. And so, I'm just wondering, did it turn out that there's more opportunities for things that you could optimize? Or maybe on the flip side, it turned out that Motorola needed more investment than was initially expected?
>
> Anders Gustafsson – Zebra Technologies Corporation – CEO:
>
> Well, first, we are very pleased for the efforts to date on integration. We feel that the integration has gone very, very well for us. There – if you look at things like the – how we designed and integrated a new sales organization, I think that was done very,

very well. The – there we had basically a blank sheet of paper that we started with, and we didn't really merge the organizations, but it was very stressful as we went through it. But looking back, I think we very quickly got the right team, knowing their roles, and we were out focusing on selling. . . .

But on the negative side, I would say, the complexity of the IT systems has been greater than we had expected. Motorola had a bit of a patchwork of systems, a lot of customization. They didn't necessarily all talk to each other. So as we pull this together, we're looking to see how we can create the platform that's across all of Zebra, to drive the right level of efficiencies to then -- to continue to generate great operating leverage benefits after we're done with this.

80.     Analysts reacted negatively to the November 10, 2015 disclosure that significant incremental spending was needed to address problems in connection with the Motorola Enterprise IT systems integration. For example, analysts at J.P. Morgan issued a report on November 11, 2015, commenting on the increased IT integration spending, in pertinent part as follows:

ZBRA now targets $200 million of synergies from the MSI acquisition by 2016 year-end, up from $150 million; positive news that is offset by an increase in onetime integration costs and re-investment in growth, which weights [sic] on quality of earnings and is making it difficult to be confident in the time-line and magnitude of the pay-back on this intense activity.

*       *       *

The firm expects to hit 4-5% long term growth, 18-20% PF EBITDA margins, and leverage ratio below 3x by 2017. The firm expects total ~$200mm in cost synergies by 2016. That said incremental acquisition related costs of $180-$200mm (10-15% in capex) was an unwelcome surprise, as IT integration with MSI is proving more costly than expected.

81.     Also, in a report to investors on November 10, 2015, analysts at Great Lakes Review discussed the increase in spending and extent of the IT migration problems, in pertinent part, as follows:

> Integration efforts going forward will focus on IT infrastructure and business systems implementations, with Zebra planning to move to a single ERP system (from two separate Oracle systems) by the end of 2017, resulting in costs of $180 million-to-$200 million through 2017, including capital expenditures as the complexity of Motorola's IT systems, described as a patchwork of systems that do not communicate well with each other, has been greater-than-anticipated.

82. In addition, analysts at Wells Fargo issued a report on November 13, 2015, discussing the unexpected increase in integration costs, in pertinent part, as follows:

> Integration Spend Well Above Expectations – Our expectations were that Zebra would spend about $150MM on the integration, but the company has already spent $220MM on Acquisition & Integration costs and $41MM in Exit and Restructuring costs and announced on the conference call that it still has another $180-$200MM of integration opx and capx remaining.

83. On February 29, 2016, Zebra filed its annual financial report on Form 10-K with the SEC for its fiscal year 2015, which was signed and certified pursuant to SOX by defendants Smiley and Gustafsson, and also signed by defendants Smith, Desai, Keyser, Ludwick, Manire, Modruson, and Roberts (the "2015 10-K"). The 2015 10-K reiterated, *inter alia,* that Zebra had identified defects in its internal controls dating back to the first quarter of 2015 and provided details on the extent of the impact of these deficiencies on the Company's ability to accurately forecast pretax income. Specifically, the 2015 10-K stated in pertinent part as follows:

> **Management's Report on Internal Control over Financial Reporting**
>
> Our management is responsible for establishing and maintaining adequate internal controls over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our management assessed the effectiveness of our internal controls over financial reporting as of December 31, 2015. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the

Treadway Commission in Internal Control-Integrated Framework as released in 2013. ***Based on this assessment, our management believes that, as of December 31, 2015, our internal controls over financial reporting were not effective, due to the identification of a material weakness.***

A material weakness is a deficiency, or combination of deficiencies, in the internal controls over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

As of the first quarter of 2015, the Company identified a material weakness related to the process to prepare and review its quarterly and annual income tax provision. The material weakness relates to deficiencies in the design and operation of controls in response to the increased complexity in the legal entity structure of the business following the Enterprise acquisition. ***These deficiencies impacted our ability to accurately forecast pretax income and deferred taxes, by legal entity, in a timely manner.***

(Emphasis added).

84.     On April 15, 2016, the Individual Defendants caused Zebra to file with the SEC and disseminate to stockholders, a Proxy Statement on Form DEF 14A (the "2016 Proxy") in connection with the Company's annual stockholder meeting to be held on May 19, 2016. The Individual Defendants drafted, approved, reviewed, and/or signed the 2016 Proxy before it was filed with the SEC and disseminated to Zebra's stockholders. The Individual Defendants knew, or were deliberately reckless in not knowing, that the 2016 Proxy was likewise materially false and misleading.

85.     Among other things, the 2016 Proxy sought stockholder approval for (i) the election of three directors, including one Class I director with a term to expire in 2018 (defendant Desai) and two Class II Directors with terms to expire in 2019 (defendants Modruson and Smith); and (ii) an advisory vote to approve the compensation of executive officers, including defendants Gustafsson and Smiley.

31

86.     With respect to the compensation of the Company's executives, the acquisition of Motorola Enterprise and the effect it had on the Company's financial condition was used as a factor when selecting peer groups. The 2016 Proxy states:

### Establishing Our Peer Group

In October 2014, Zebra acquired the Enterprise business of Motorola Solutions, Inc. The Enterprise business had approximately $2.5 billion in net sales in 2013 when owned by Motorola Solutions, resulting in Zebra's pro forma net sales for 2013 being approximately $3.5 billion. In July 2014, while the acquisition was pending, the Committee engaged Willis Towers Watson to review Zebra's peer group and make recommendations regarding changes to Zebra's peer group for purposes of reviewing and analyzing both executive compensation and nonemployee director compensation. The peer group is one factor considered by the Committee when reviewing executive and non-employee director compensation. The Committee reviewed market data prepared by Willis Towers Watson on the financial performance of 15 publicly-traded companies viewed as comparable to Zebra if the acquisition were completed. Current and prospective members of Zebra's peer group were evaluated along the following factors: complexity and business model (similar industry, comparable cost structure, business model, level of complexity and degree of global coverage); size of proposed peer group member, with revenue being the most important factor (revenue should be 0.5x to 2.0x Zebra 2013 pro forma sales of $3.5 billion); size of peer group, with 15-20 members of the peer group regarded as appropriate; competitive talent market; and investor profile (i.e., the proposed peer group member is considered a reasonable investment alternative; and the proposed peer group member attracts investors with the similar risk/return expectations). The Committee then approved the peer group recommended by Willis Towers Watson. Six of these 15 companies (Arris Group, Inc., Ciena Corporation, KLA-Tencor Corporation, Lam Research Corporation, Teradata Corporation and Trimble Navigation Limited) were in the peer group used for 2014 executive compensation purposes.

87.     Per the 2016 Proxy, the peer group factor is important because it "assists the Committee in assessing Zebra's relative size and performance against all peer group companies. This information offers a perspective on the appropriateness of the peer group membership for purposes of Zebra's executive compensation and how well Zebra, and therefore its executive

officers, are performing vis-a-vis peer group members." Similarly, the Company stated, "As such, the Company's acquisition of Motorola was an important factor when approving executive compensation and any information regarding the acquisition, and any problems with the integration, would have been material information to Zebra stockholders when casting a vote.

88.     Indeed, the acquisition of Motorola Enterprise was mentioned several times in the 2016 Proxy with regard to the discussion of executive compensation including:

   a.     *Acquisition of Enterprise Business of Motorola Solutions, Inc.*

        In October 2014, Zebra acquired the Enterprise business of Motorola Solutions, Inc. The Enterprise business had approximately $2.5 billion in net sales in 2013 when owned by Motorola Solutions. Zebra's net sales in 2013 were $1.038 billion. As a result of the acquisition being completed in October 2014, Zebra's GAAP-based net sales in 2014 were $1.671 billion and in 2015 were $3.652 billion. The acquisition resulted in new and different recruiting needs with regard to executive officer positions, as well as changes in the duties of current executive officers. For example, our sales and marketing function was separated in late 2014 into global sales and global marketing positions, each of which was filled by a new executive officer joining Zebra in 2014. Another new executive officer, William Burns, joined Zebra in 2015 as our Senior Vice President, Enterprise Visibility and Mobility. Mr. Burns is a named executive officer.

   b.     *The compensation data presented to the Committee was prepared in anticipation of completing the acquisition of the Enterprise business of Motorola Solutions, Inc., which was expected to result in annual net sales of Zebra increasing from $1.038 billion in 2013 to over $3.5 billion in 2015. Zebra completed the acquisition in October 2014. As expected, and as described below, the compensation data reflected a wide disparity from the median for each element of compensation for most executive officer positions, including the CEO.*
        • Base Salary. The market compensation data indicated that our individual executive officers' base salary compensation as of July 2014 ranged from 19% below to 52% above the consensus market median. The market data indicated that Mr. Gustafsson's base salary was 7% below the consensus market median.

- Target Annual Cash Incentive Compensation. The market data for target annual cash incentive compensation indicated that our individual executive officers' target annual cash incentive compensation as a percent of base salary as of July 2014 ranged from 29% below to 31% above the consensus market median. In addition, the target annual cash incentive compensation in absolute dollar terms ranged from 31% below to 158% above the consensus market median. The market data indicated that Mr. Gustafsson's target annual cash incentive as a percentage of base salary was 29% below the consensus market median and his target annual cash incentive compensation in absolute dollar terms was 25% below the consensus market median.

- Long-Term Incentive Equity Award. The market data for target long-term incentive equity awards indicated that our executive officers' equity compensation from the 2014 annual grant to then Zebra executive officers and the 2014 annual grant by Motorola Solutions to employees of the Enterprise business who were expected to become Zebra executive officers upon completing the acquisition of the Enterprise business ranged from 37% below to 165% above the consensus market median. Mr. Gustafsson's target long-term incentive equity award from his 2014 annual grant was 37% below the consensus market median.

(Emphasis added).

89.     The 2016 Proxy also set forth to Zebra stockholders that the Company had a pay-for-performance philosophy. For example, the 2016 Proxy in a section titled "Setting 2015 Compensation and Incentive Targets for Executive Officers" discusses the philosophy of setting executive compensation stating:

> Zebra's total rewards program is designed to align our business strategy with increasing stockholder value. An important aspect of our compensation philosophy and programs is to pay competitively and reward for company and individual performance. Base pay, annual incentive and long-term equity components are determined within a pay-for-performance approach, targeted generally at market median when target performance goals are achieved. Superior performance can result in above median compensation when target financial or individual performance goals are exceeded.

34

90.     The Individual Defendants' statements in the 2016 Proxy, which clearly represented that the Company followed a pay-for-performance policy were false and misleading because the 2016 Proxy failed to disclose that the Company's financial performance was illusory and misstated. By the time the 2016 Proxy was issued, the Individual Defendants already knew, *inter alia*, that there were severe integration issues associated with Zebra's acquisition of Motorola Enterprise, and that because of numerous accounting improprieties (related in part to the Motorola Enterprise Acquisition) Zebra would need to restate its financial statements for 2015 and the first two quarters of 2016.

91.     Had the Individual Defendants made truthful disclosures in the 2016 Proxy, the executive compensation awarded to Zebra's named executive officers would have been severely curtailed.

92.     Further, if truthful disclosures had been made in the 2016 Proxy, defendants Modruson, Smith, and Desai would not have been re-elected to the Board. Accordingly, the 2016 Proxy, as set forth above, was false and misleading when issued.

93.     During a May 10, 2016, conference call with analysts and investors, defendant Smiley disclosed that certain commissions that should have been accrued during fiscal year 2015, had not been accrued and were instead being accounted for in the first quarter of 2016 (without formally restating previously reported earnings for 2015).

94.     The aforementioned statements contained in ¶¶ 60-93 were materially false and misleading when made. Each statement failed to disclose and/or misrepresented the following facts that were known to Individual Defendants: (1) There were severe integration issues associated with the Motorola Enterprise Acquisition; (2) the "cost savings" and "cost synergies" realized from the Motorola Enterprise Acquisition in the short run would largely be offset by

hundreds of millions of dollars in incremental spending necessary to complete the acquisition and to remedy severe and undisclosed problems encountered during the migration from Motorola-supported IT systems to those of Zebra's; (3) the efforts of Zebra's Tax Department were severely undermined due to the difficulties in obtaining sales data and accounting information from Motorola and inputting it into the existing ERP system at Zebra; (4) because of the material weaknesses that were identified in its internal controls and procedures over financial reporting and disclosure, Zebra lacked the ability to provide financial guidance; and (5) Zebra was understating its income taxes through the end of FY15, had under-accrued certain 2015 estimates, most notably for its sales commission plan, and overstated the net realizable value of trade receivables acquired in connection with the Motorola Enterprise assets acquisition.

95.     On August 19, 2016, Zebra filed a Form 8-K with the SEC detailing personnel changes in its accounting department. Specifically, in the Form 8-K, Zebra announced that "[e]ffective August 15, 2016, the Board of Directors appointed Colleen O'Sullivan as the Chief Accounting Officer ("CAO") for Zebra Technologies Corporation." The Form 8-K further disclosed that "Michael Smiley, Zebra's Principal Financial Officer, has served in an interim capacity as Zebra's Principal Accounting Officer since April 6, 2016."

96.     Finally, on November 1, 2016, Zebra issued a press release disclosing that it had decided to restate its previously issued financial statements for fiscal year 2015 and the first and second quarters of 2016. The release stated in pertinent part as follows:

> The Audit Committee of the Board of Directors made the decision upon the recommendation by management, in consultation with the company's independent registered public accounting firm, Ernst & Young. The restatement is expected to be completed by Nov. 15, 2016, at which time the company will announce its third quarter 2016 earnings results. The restatement will correct the financial statements for known errors, including those that were previously disclosed in filings with the Securities and Exchange Commission

("SEC") as immaterial. *The errors primarily relate to the company's accounting for income taxes, the under accrual of certain 2015 estimates, most notably for its sales commission plan, and an adjustment to the net realizable value of trade receivables acquired in connection with the company's acquisition of the Enterprise business of Motorola Solutions, Inc. ("Enterprise acquisition").*

Anders Gustafsson, CEO of Zebra Technologies, stated, *"The restatement is the result of the cumulative impact of fiscal 2015 errors primarily associated with the Enterprise acquisition.* . . .

For 2015, on a GAAP basis, the impact of the corrections will be to *increase the loss for the full year ended Dec. 31, 2015 by approximately $17 million* on a pretax basis, which includes approximately $11 million recorded in the first six months of 2016 as previously disclosed in SEC filings. *On an after-tax basis, the impact of the corrections will increase the loss for the full year ended Dec. 31, 2015 by up to $35 million, which also includes the impact of tax-related items.* As a result, for the first six months of 2016, the company will decrease the pre-tax loss (increase the profitability) reflected in its 2016 results by approximately $11 million on a pretax basis, or $6 million after-tax. The corrections will be made in restated financials to be included in amendments to Zebra's Form 10-K for the year ended Dec. 31, 2015 and Form 10-Q's for the quarters ended April 2, 2016 and July 2, 2016.

For additional background, as disclosed in its prior filings with the SEC, when preparing its 2015 financial statements, *Zebra identified a material weakness related to the process to prepare and review its quarterly and annual income tax provision.* The material weakness relates to deficiencies in the design and operation of controls in response to the increased complexity in the legal entity structure of the business following the Enterprise acquisition. *These deficiencies impacted Zebra's ability to accurately forecast pretax income and deferred taxes, by legal entity, in a timely manner.* Zebra continues to work diligently to implement its remediation plan to address the material weakness.

(Emphasis added).

97.     Analysts were quick to react following Zebra's announcement of the restatement.

For example, that same day, Great Lakes Review issued an analyst report stating, in pertinent

part, as follows:

> Zebra, the leader in specialty printers, scanners and mobile computers, is restating its 2015 GAAP results. As previously disclosed in the 2015 Form 10-K, in 1Q15, Zebra identified a material weakness in its internal control over financial reporting related to reviewing and preparing quarterly income taxes. Previous identified items totaling $11 million pre-tax (expenses incurred in 2016 that should have been booked in 2015) were deemed immaterial. However, with additional items for 2015 discovered, the total amount now becomes material, so Zebra is "wiping the slate clean" for 2015 by restating the old and new errors. The result will be a maximum GAAP after-tax loss of up to $35 million for 2015 (including the amount noted above), expected to be completed by November 15th, when Zebra will report 3Q16 results.

98.     The Great Lakes Review report also noted that Zebra had finally taken certain steps to bolster its woefully inadequate accounting department, stating in pertinent part, that:

> Zebra has already taken steps to address the weakness, including adding a new VP of Tax in the Spring of 2016 – Susan Clifford, previously over 10 years with Matthews International . . . and two new team members to work with Ms. Clifford; as well as a new Chief Accounting Officer in August 2016 (the previous left for health reasons) – Colleen O'Sullivan, previously with Career Education Corporation.

99.     Also, on November 1, 2016, Northcoast Research issued an analyst report discussing Zebra's numerous accounting issues, including its reporting systems and the inadequacy of its staffing levels. The Northcoast Research report stated, in pertinent part, that:

> The Restatement – We knew the accounting department at Zebra was undermanned following the Enterprise acquisition as a result of no senior level financial executives joining Zebra from Motorola and their underlying reporting systems the company inherited were a disaster. The company previously disclosed internal control issues in the area of income taxes and sales commission errors. Frankly, we were surprised they did not previously restate results. We knew why, they hoped to avoid the negative implications a restatement brings, but ultimately they had to anyways, and until their systems are properly updated, there is still the potential for additional accounting errors.

100.    On November 14, 2016, Zebra issued a press release announcing that the Company had completed its restatement and filed its Annual Report on Form 10-K/A for the fiscal year ended December 31, 2015, as well as its amended Quarterly Reports on Form 10-Q/A for the periods ended April 2, 2016, and July 2, 2016.

101.    The next day, Zebra filed a Form 8-K with the SEC announcing that defendant Smiley was "stepping down as Chief Financial Officer to pursue other opportunities."

**Damages to Zebra**

102.    The Individual Defendants' breaches of fiduciary duty have caused injury to Zebra, for which the Individual Defendants should be held personally liable. As a result of the Individual Defendants' misconduct, Zebra suffered costs and expenses in connection with restating its financials, harm to the reputation of the Company, and tax penalties and their concomitant costs.

103.    Moreover, aside from ruining Zebra's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in a federal securities case titled *City of Warren Police and Fire Retirement System v. Zebra Technologies Corporation et al.*, Case No. 2:17-cv-04412-LDW-AKT, pending in the United States District Court for the Eastern District of New York (the "Securities Action"). The Securities Action alleges that the Company and defendants Smiley and Gustafsson violated federal securities laws by issuing false and misleading statements to the investing public, specifically focusing on the October 2014 acquisition of Motorola Enterprise, and in particular, the defendants' failure to disclose problems the Company was experiencing in connection with the acquisition and the significant costs it would take to remedy them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

106.     Plaintiff is an owner of Zebra common stock and was an owner of Zebra common stock at all times relevant hereto.

107.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

108.     At the time this complaint was filed, the Board consisted of eight directors: defendants Gustafsson, Smith, Keyser, Ludwick, Manire, Modruson, Roberts, and Desai (the "Director Defendants").

109.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Zebra Board to institute this action against the Individual Defendants. Such a demand would have been a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons.

**Demand is Futile as to the Director Defendants Because They Face a Substantial Likelihood of Liability**

110.     The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that Zebra's SEC filings, press releases, and other public statements and presentations its behalf concerning its business, operations, prospects, internal controls, and financial statements were accurate.

111.    As Zebra's directors, the Director Defendants were keenly aware of key facts related to the Company's operations, specifically the Motorola Enterprise Acquisition. As defendant Gustafsson stated during Zebra's May 10, 2016 earning call, "[f]rom the beginning we've had a very structured process to ensure a successful integration. We established an internal business transformation office, or BTO, to oversee the execution of the integration. ***The BTO has executive management and Board oversight,*** as well as external resources to ensure that we implement best practices." (Emphasis added). Therefore, the Director Defendants would have been aware of the serious issues Zebra was experiencing with the integration.

112.    Moreover, the fact that the Motorola Enterprise Acquisition was the largest in Zebra's history indicates that the Director Defendants closely followed the status of Motorola Enterprise's integration. Zebra paid a substantial price of $3.45 billion, 10.9x its EBITDA as of the time of the deal, to acquire Motorola Enterprise. The Company also took on an enormous $3.25 billion of debt in connection with the acquisition and continued to incur substantial integration costs after the acquisition. Indeed, analysts at J.P. Morgan, in a note issued on November 11, 2015, stated that "incremental acquisition related costs of $180-$200mm (10-15% in capex) was an unwelcome surprise, as IT integration with MSI is proving more costly than expected."

113.    The Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the false and misleading

statements discussed above that failed to disclose that the Company was, *inter alia,* experiencing serious problems in connection with the Motorola acquisition and that there would be significant costs to remedy them.

114.    The Director Defendants' engagement in the making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Zebra to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do, making demand futile.

**Defendant Gustafsson is Interested and Lacks Independence**

115.    The principal professional occupation of defendant Gustafsson is director and CEO of Zebra. In his position as director and CEO, Gustafsson will receive substantial monetary compensation and other benefits from the Company. Gustafsson's annual salary, bonuses, and other compensation – which total $5,852,477 – will be approved by the Company's current Compensation Committee, comprised of defendants Smith, Keyser, Roberts, and Desai and therefore, Gustafsson lacks independence from these directors. Gustafsson is also incapable of considering a demand to commence and prosecute this action because he faces additional substantial liability as he is named as a defendant in the Securities Actions. Therefore, demand is excused as against Gustafsson.

**Audit Committee Members Smith, Ludwick, Manire, and Modruson Face A Substantial Likelihood of Liability**

116. Defendants Smith, Ludwick, Manire, and Modruson were members of the Audit Committee at the time of the improper statements detailed herein. Pursuant to the Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia,* the integrity of Zebra's financial statements and internal control over financial reporting, the internal audit function, the assessment and management of risk, and Zebra's compliance with legal requirements. Notably, in performing these duties, defendants Smith, Ludwick, Manire, and Modruson were required to discuss with management and the Company's independent auditor the annual financial statements, including the disclosures in management's discussion and analysis. Defendants Smith, Ludwick, Manire, and Modruson were required to discuss with management and the Company's independent auditor all of the Company's SEC filings during the Relevant Period. Defendants Smith, Ludwick, Manire, and Modruson also were required to discuss with management the Company's major financial risk exposures which would include Zebra's acquisition of Motorola Enterprise, and any problems with the integration. Defendants Smith, Ludwick, Manire, and Modruson breached their fiduciary duties of loyalty because the Audit Committee permitted the Company to make the improper statements discussed above. Therefore, defendants Smith, Ludwick, Manire, and Modruson each face a substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them is futile.

<u>COUNT I</u>

<u>DERIVATIVELY AGAINST THE INDIVIDUAL
DEFENDANTS FOR BREACH OF FIDUCIARY DUTY</u>

117. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

118.     The Individual Defendants owed and owe Zebra fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Zebra the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

119.     All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

120.     The Individual Defendants caused or allowed Zebra to lack requisite internal controls, and, as a result, the Company engaged in deceptive financial reporting and guidance that has injured the Company and its reputation.

121.     The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

122.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Zebra has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT

123.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

125. The 2016 Proxy violated Section 14(a) and Rule 14a-9 because it solicited Zebra stockholder votes for, *inter alia*, director reelection and executive compensation, while simultaneously misrepresenting and/or failing to disclose that there were severe integration issues associated with Zebra's acquisition of Motorola Enterprise, and that because of numerous accounting improprieties (related in part to the acquisition of Motorola Enterprise) the Company would need to restate its financial statements for 2015 and the first two quarters of 2016.

126. The Individual Defendants' statements in the 2016 Proxy, which clearly represented that the Company followed a pay-for-performance policy were false and misleading because the 2016 Proxy failed to disclose that the Company's financial performance was illusory and misstated. By the time the 2016 Proxy was issued, the Individual Defendants were well aware of the significant problems associated with the Motorola Enterprise Acquisition, and therefore as a result, the Company's purported financial performance (issued under the Individual Defendants' direction and on their watch) that the executive compensation was based upon was materially misstated.

127. The Individual Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made misleading in violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2016 Proxy, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2016 Proxy.

128. In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2016 Proxy were materially false and misleading.

129.    The omissions and false and misleading statements in the 2016 Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the reelection of directors and compensation for executive officers. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2016 Proxy and in other information reasonably available to stockholders.

130.    As a direct and proximate result of the dissemination of the false and/or misleading 2016 Proxy, the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors and pay excessive compensation to executive officers, nominal defendant Zebra suffered damage and actual economic losses (*i.e.,* wrongful re-election of directors and paying compensation based on inflated financials to executives) in an amount to be determined at trial.

## JURY DEMAND

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duty;

B.    Ordering Zebra to implement enhanced corporate governance and internal control procedures including to appropriately test and then strengthen Zebra's internal audit and control functions;

C.    Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

Dated:  August 21, 2018

Respectfully submitted,

By: */s/ Bruce C. Howard*

Bruce C. Howard
*bhoward@siprut.com*
**SIPRUT PC**
17 North State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.754.9616

Aaron Brody
*abrody@ssbny.com*
(*pro hac vice to be submitted*)
**STULL, STULL, & BRODY**
6 East 45th Street
New York, NY 10017
Phone: 212.687.7230
Fax: 212.490.2022

*Attorneys for Plaintiff*

## VERIFICATION

_Murray Zucker_ affirms under penalty of perjury:

I hereby verify that I have read the foregoing Verified Shareholder Derivative Complaint. The factual allegations regarding my status as a shareholder of Zebra Technologies Corporation are true and correct to the best of my knowledge. All other factual allegations are based on information and belief and are true and correct to the best of my knowledge.

I affirm the foregoing statement this ___14___ day of ___AUGUST___, 2018.

_Murray Zucker_